**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>**THE ISLAND EMPLOYEE COOPERATIVE, INC.,** [1]<br><br>**Debtor.** | Chapter 11<br><br>Case No. 21-10253 |

| | |
|---|---|
| In re:<br><br>**THE GALLEY,** [2]<br><br>**Debtor.** | Chapter 11<br><br>Case No. 21-_____ |

**DECLARATION OF KRISTY WIBERG IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Kristy Wiberg, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     I am the President of The Island Employee Cooperative Inc. ("IEC") and The Galley ("Galley" and, together with IEC, the "Debtors"). I also am a member of the board of directors of the Debtors.

2.     I have served as President of the IEC since March 2020. Overall, I have worked at IEC in various roles for more than a decade, including managing multiple departments before moving into my current position with the IEC leadership team.

3.     I am familiar with the Debtors' day-to-day operations, assets, businesses, debt structure, and financial affairs. I am authorized to submit this Declaration in support of the

---

[1] The principal place of business for The Island Employee Cooperative, Inc. and The Island Employee Cooperative, Inc.'s address is 1 Burnt Cove Road, Stonington, Maine 04681.

[2] The principal place of business for The Galley and The Galley's address is 1 Burnt Cove Road, Stonington, Maine 04681.

Debtors' chapter 11 petitions and the First Day Motions (as defined below), as well as other pleadings that may be filed in the cases.  All facts set forth herein are based on my personal knowledge, on information supplied to me by others within the Debtors' organizations, upon my review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtors' operations, assets, financial condition, and present liquidity needs.  If I were called to testify, I could and would testify competently to the facts set forth herein.

4.      On September 23, 2021 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Maine (the "Bankruptcy Court") to commence the above-captioned chapter 11 cases.  To familiarize the Bankruptcy Court with the Debtors, their businesses, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this Declaration as follows:

**Part I** provides a general overview of the Debtors' history and operations;

**Part II** provides an overview of the Debtors' prepetition debt structure;

**Part III** describes the circumstances leading to these chapter 11 cases; and

**Part IV** sets forth the factual bases for the relief requested in each of the First Day Motions.

## I.      General Overview of the Debtors' History and Operations

5.      IEC is an employee-owned cooperative formed under the laws of the State of Maine.  Galley is a corporation formed under the laws of the State of Maine.

6.      IEC is the sole stockholder of Galley.  IEC and Galley share the same membership on their boards of directors.

7.      As an employee-owned cooperative, IEC has issued both Class A and Class B shares.  The individuals who presently hold those shares are identified in the equity disclosure form filed with IEC's Chapter 11 Petition.

8.      The Debtors, in their present form and with their present primary assets, were established through a stock and asset transaction from the former owner, Vernon Seile ("Siele"), on or about June 2014.

9.      As of the Petition Date, Galley owes several unrelated real estate properties located in Stonington and Deer Isle, Maine, including the properties at which IEC operates its businesses.  More specifically: (i) Burnt Cove Market and V&S Variety are located at 1 Burnt Cove Road, Stonington, Maine; and (ii) The Galley Grocery operates at 287 North Deer Isle Road, Deer Isle, Maine.  In addition, Galley owns a mobile home asset located at 280 North Deer Isle Road, Deer Isle, Maine, that is leased to a tenant, and Galley owns the "Queen's Closet" building and lot located at South Burnt Cove, Stonington, Maine.

10.      V&S Variety is housed in a 5,000 square foot retail store and sells a wide range of items, including greeting cards, fabric, yard goods, house wares, small appliances, clothes, and everyday hardware.

11.      Burnt Cove Market is located on the edge of the Stonington archipelago, and Burnt Cove Market has been serving island residents and visitors for more than 75 years as a full-service grocery store.

12.      The Galley Grocery (also referred to simply as The Galley)[3] is located in the center of Deer Isle, just four miles from the Deer Isle-Sedgwick bridge, and two miles from

---

[3] For clarity, The Galley is the name of a grocery store operated by IEC.  The Galley store is separate from The Galley entity (i.e., the debtor), which is the entity that owns the real estate at which The Galley store operates.

historic Deer Isle Village.  The Galley provides groceries, fresh produce, and other items for residents and visitors year-round.

13.     In recent years, through operating the Burnt Cove Market, V&S Variety, and The Galley, the Debtors have generated approximately $8.5 million to $9.5 million in annual revenue, while annual revenue is projected to reach $10 million in 2021.

## II.     Overview of Debtors' Prepetition Debt Structure

14.     Prior to the Petition Date, the Debtors engaged in various transactions with multiple parties that resulted in the Debtors incurring certain debt obligations and granting liens on certain of the Debtors' assets to secure those obligations.  Those obligations and liens are summarized next.[4]

15.     **Coastal Enterprises, Inc. ("CEI")**.  On or about June 11, 2014, CEI made a loan to the Debtors in the original principal amount of **$1,000,000.00** (the "CEI Loan").  CEI filed two UCC Financing Statements on or about June 13, 2014, at Filing Numbers 20140613109000028-27 and 20140613109000031-71 (both of which were continued, on January 15, 2019, and September 14, 2020, respectively), which assert a security interest in all or substantially all of IEC's personal property, including cash collateral.  CEI also was granted a mortgage on Galley's real estate.

16.     **Cooperative Fund of New England, Inc. ("CFNE")**.  On or about June 11, 2014, CFNE made a loan to the Debtors in the amount of **$800,000.00** (the "CFNE Loan").  CFNE filed a UCC Financing Statement on or about June 13, 2014, at Filing Number 20140613109000032-82 (which was continued on June 11, 2019), which asserts a security

---

[4] The summaries are qualified in their entirety by the applicable documentation.  The Debtors reserve all rights regarding the claims and liens described herein.

interest in all or substantially all of IEC's personal property, including cash collateral.  CFNE

also was granted a mortgage on Galley's real estate.

17.    **National Cooperative Bank, N.A. ("NCB")**.  On or about June 11, 2014, IEC

and The Galley received a loan in the amount of **$1,800,000.00** (the "$1.8M Loan") from Seile,

and a UCC Financing Statement was filed on or about June 13, 2014, at Filing Number

20140613109000038-48, which asserted a security interest in all or substantially all of IEC's

personal property, including cash collateral.  On or about March 20, 2015, NCB acquired the

$1.8M Loan (the "NCB Loan"), and the UCC Financing Statement was assigned in its entirety to

NCB on or about June 9, 2015.  At the same time, Siele's UCC Financing Statement as to Galley

also was assigned in its entirety to NCB.  NCB also holds a mortgage on Galley's real estate to

secure the NCB Loan.[5]

18.    **C&S Wholesale Grocers, Inc. ("C&S")**.  On or about October 14, 2019, C&S

and IEC entered into a certain Supply Agreement (as has been amended) and that certain Term

Note for the inventory deferment loan of **$350,000.00** (the "C&S Loan Transaction").  C&S filed

a UCC Financing Statement on or about November 1, 2019, at Filing Number

20191101109000095-99, which asserts a security interest in all or substantially all of IEC's

personal property, including cash collateral.[6]

19.    **The Small Business Association ("SBA")**.  On or about July 2, 2020, IEC and

SBA entered into that certain Loan Agreement and that certain Promissory Note for an Economic

---

[5] As part of NCB's acquisition of the $1.8M Seile Loan, NCB, CEI, and CFNE entered into that certain Agreement Regarding Financial Covenants and Reporting Requirements dated March 20, 2015.  At the same time, NCB, CEI, CFNE, and Seile entered into that certain First Amendment to Intercreditor Agreement.  For present purposes, the effect of the agreements, to the best of my understanding, is that NCB, CEI, and CFNE hold first position liens pari passu, and their liens are senior to Siele's junior (fourth) mortgage on the real estate.  Siele does not hold a perfected lien on any assets of IEC.  The Debtors reserve any and all rights regarding the validity, extent, or perfection of any lien that Seile may have or may assert in the case, as well as any and all rights regarding the amount or treatment of any claim Seile may have or may assert.

[6] C&S provided replacement financing for the prior loan with Associated Grocers of New England.

Injury Disaster Loan in the amount of **$150,000.00** (the "SBA Loan Transaction").  On or about July 2, 2020, IEC and SBA entered into that certain Security Agreement in order to secure IEC's obligations to SBA evidenced by the SBA Loan Transaction.  SBA filed a UCC Financing Statement on July 26, 2020, at Filing Number 20200726109000025-16, which asserts a security interest in all or substantially all of IEC's personal property, including cash collateral.

20.     **DUMAC Business Systems, Inc. ("DUMAC")**.  DUMAC (also referred to as Balboa) may have a purchase money security interest in certain equipment leased by IEC, with a UCC Financing Statement filed on or about March 11, 2020, at Filing Numbers 20200311109000078-54.  DUMAC does not hold a blanket lien over IEC's personal property generally, nor a lien in cash collateral, more specifically.

21.     **Seile**.  As part of the 2014 transaction, Seile issued two loans to IEC and Galley, as co-borrowers: the $1.8M Loan and an additional $1.5 million loan (the "$1.5M Loan" and, together with the $1.8M Loan, the "Seile Loans").  NCB acquired the $1.8M Loan from Seile. Seile retained the $1.5M Loan.  The UCC Financing Statements related to the Seile Loans were assigned in whole to NCB as of June 9, 2015.  Seile never filed or refiled a UCC Financing Statement as to the $1.5M Loan after the assignment.  Siele may hold a junior mortgage on Galley's real estate as to the $1.5 Million Loan.[7]

## III.     Circumstances Leading Up to the Chapter 11 Filing

22.     The loans with NCB, CEI, and CFNE matured in June 2021.  Both before and after that maturity, the Debtors diligently explored a range of options to address their ongoing challenges related to refinancing their senior debt obligations, restructuring their balance sheets, improving cash flow, and, overall, reorganizing the businesses to ensure long-term success for

---

[7] Seile also may assert that he provided at **$90,000.00** inventory loan.  That loan, however, to the extent it ever constituted a valid claim, was paid off and is no longer an obligation of the Debtors.

the companies, their employees, and the community.  Ultimately, the Debtors, after consultation with their advisors, including Bernstein Shur Sawyer & Nelson, P.A. ("BSSN"), Eaton Peabody ("EP"), and Spinglass Management Group, LLC ("Spinglass"), determined to commence these chapter 11 cases to stabilize and improve the Debtors' balance sheets, bifurcate some of their significant prepetition debt, and optimize the value of their estates for the benefit of all parties in interest through a chapter 11 debt restructuring under the Small Business Reorganization Act.

23.     As part of the Debtors' pre-filing diligence and analysis, the Debtors also negotiated and entered into that certain Restructuring Support Agreement the ("RSA") with NCB, CEI, and CFNE, a copy of which is attached to the RSA Motion (defined below).  Under the RSA, NCB, CEI, and CFNE have agreed to provide exit financing in the form of refinancing their senior debt obligations, among other significant benefits for the Debtors and their estates. The RSA is discussed in more detail below.

## IV.    **First Day Motions**[8]

24.     The Debtors have filed or expect to file a number of motions (collectively, the "First Day Motions") seeking orders granting various forms of relief.  The Debtors seek an emergency hearing as to certain of the First Day Motions, while others will be set for hearing in the ordinary course.

25.     I have reviewed the First Day Motions, including the exhibits, and I believe that the relief sought in the First Day Motions is necessary to stabilize the Debtors' businesses, facilitate the efficient administration of the chapter 11 cases, lessen the impact of the chapter 11 cases on the Debtors' day-to-day operations and employees, and facilitate a successful reorganization of the Debtors.  I believe that the relief requested in the First Day Motions

---

[8] Capitalized terms used but not defined in this First Day Motions section of this Declaration shall have the meaning ascribed to such terms in the respective First Day Motion.

(including, specifically, those for which an emergency hearing is being sought) is critical to avoiding imminent and irreparable harm in the early stages of these cases to the Debtors, their estates, and critical stakeholders, including customers, creditors, and employees, and to maximize the value of their assets for the benefit of all stakeholders.

**A.    MOTION OF DEBTOR FOR ENTRY OF AN ORDER ON AN INTERIM AND THEN FINAL BASIS: (I) AUTHORIZING THE USE OF CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION; AND (III) SETTING A FINAL HEARING (the "Cash Collateral Motion")**

26.    I understand that through the Cash Collateral Motion, IEC[9] seeks relief, <u>inter alia</u>, authorizing the IEC to use the Cash Collateral of the Prepetition Secured Creditors and providing adequate protection to the Prepetition Secured Creditors.

27.    IEC has an immediate and critical need for the use of Cash Collateral in the earliest days of the chapter 11 cases and beyond.  I believe that use of Cash Collateral will allow IEC to fund necessary and imminent expenses required for IEC to maintain operations, as well as for IEC to fund other necessary expenses in chapter 11, such as employee payroll and benefits and utility services, which IEC believes will preserve and maximize the value of its estate.

28.    I understand that, other than Cash Collateral, IEC does not have access to cash necessary to fund its operations in the earliest days of these cases.  Accordingly, access to Cash Collateral will provide IEC with the funds necessary to ensure that IEC has sufficient working capital and liquidity to maintain operations and proceed through its reorganization.  I believe that without access to such liquidity and authority to use Cash Collateral, IEC, its employees, and other constituents will face imminent and irreparable harm.

---

[9] Galley has not filed a motion for authority to use cash collateral because it did not maintain bank accounts as of the Petition Date.

29.     According to the relief proposed by IEC through the Cash Collateral Motion, I understand that IEC shall be authorized to use Cash Collateral in accordance with the Budget, attached to the Cash Collateral Motion as **Exhibit A**.  The Budget was carefully prepared by IEC in consultation with BSSN and Spinglass, and it is based on historic performance with adjustments for anticipated future events.   The Budget reasonably and accurately reflects projected revenues and expenses for the Debtors in the period depicted therein.  I believe the Budget contains sufficient projected revenue and disbursements for IEC to maintain operations, maintain the condition of its assets, and to otherwise meet its postpetition obligations in the ordinary course.

**B.     MOTION OF DEBTOR FOR ENTRY OF AN ORDER ON AN INTERIM AND THEN FINAL BASIS: (I) AUTHORIZING CONTINUED USE OF THE DEBTOR'S EXISTING BANK ACCOUNTNS AND CASH MANAGEMENT PROCEDURES, BANK ACCOUNTS; (II) AUTHORIZING CONTINUED USE OF THE DEBTOR'S EXISTING BUSINESS FORMS AND CHECKS; AND (III) GRANTING RELATED RELIEF ("Cash Management Motion")**

30.     I understand that through the Cash Management Motion, IEC[10] seeks authority to continue and maintain certain procedures and practices related to its business operations and cash management, including, inter alia, to continue to use existing bank accounts and business forms as consistent with prepetition practices.

31.     Prior to the commencement of its case, and in the ordinary course of business, IEC maintained certain Cash Management Procedures to efficiently collect, monitor, transfer, and disburse funds generated by and received during the operations of the Stores.  I understand that the Cash Management Procedures are critical to IEC's ability to efficiently monitor and

---

[10] Galley has not filed a motion for authority to use and maintain bank accounts because it did not maintain bank accounts as of the Petition Date.

control its cash positions across its multiple lines of business and to ensure timely and accurate

payment of liabilities, among other things, for each of the Stores.

32.    As part of the Cash Management Procedures, IEC has established an

interconnected system of bank accounts to manage and monitor receipts and expenses for its

multiple lines of business.  Specifically, as of the Petition Date, IEC maintained the following

Bank Accounts related to the Stores:

| Bank | Account No. (Last 4 Digits) | Account Description |
|---|---|---|
| Bar Harbor Bank & Trust ("BHBT") | 8801 | General operating account for BCM, used for in-store revenue and paying operating expenses |
| | 8850 | General operating account for The Galley, used for in-store revenue and paying operating expenses |
| | 8884 | General operating account for V&S, used for in-store revenue and paying operating expenses |
| | 3181 | Sweep Account: Automatically moves money from and to each of the other three BHBT operating accounts on a daily basis, including to avoid overdrafts in any account |
| | 8383 | Legacy savings account to be closed |
| Camden National Bank ("CNB") | 6644 | ATM account for BCM |
| | 6655 | ATM account for The Galley (also used for certain secured debt service) |
| | 6666 | ATM account for V&S |
| | 9708 | Sweep Account: Automatically moves money from and to each of the other three CNB operating accounts on a daily basis, including to avoid overdrafts in any account[11] |
| | 9598 | Legacy savings account to be closed |

---

[11] IEC also has the ability to transfer funds between the BHBT accounts and the CNB accounts as needed, although it historically has not done so.

33.     I understand that IEC also seeks relief to continue using existing Business Forms. In the ordinary course of business, IEC uses a third party to process checks that contain IEC's name and address printed thereon.  To minimize administrative expense and delay, I believe that it is important that IEC continue to use its Business Forms substantially in the forms existing immediately prior to the Petition Date, without reference to the "Debtor-in-Possession" status.  I also submit that parties in interest—including vendors and employees—will not be prejudiced if IEC is authorized to continue to use the Business Forms substantially in the form existing immediately before the Petition Date until the supply of such Business Forms is exhausted.  Such parties undoubtedly will be aware of IEC's status as debtors-in-possession.

34.     In sum, because of the nature of IEC's operations, any disruption to the Cash Management Procedures and use of the Bank Accounts would harm IEC and its estate.  Without maintaining these systems, IEC would be unable to track incoming receipts and make on-time payments, thereby hampering IEC from monitoring and maintaining its liquidity postpetition. This, along with the possibility that third parties would refuse to provide essential services in the event IEC fails to remit payment, as well as the potential inability to continue using ATM accounts for customers looking to purchase goods with cash, could cause diminution in the value of IEC's estate to the detriment of all parties in interest.

**C.      MOTION OF DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO: (I) PAY PRE-PETITION EMPLOYEE AND CONTRACTED CONSULTANT COMPENSATION AND RELATED PAYROLL AND BENEFIT OBLIGATIONS; AND (II) CONTINUE EMPLOYEE BENEFIT PROGRAMS IN THE ORDINARY COURSE (the "<u>Payroll Motion</u>")**

35.      I understand that through the Payroll Motion, IEC[12] seeks authority to, <u>inter alia</u>, maintain various employee and employee-related programs and fund certain wage and other obligations that arose prior to the Petition Date.

36.      As part of its business operations, across the three stores, IEC had two salaried, full-time employees (the "<u>Salaried Employees</u>"), 30 full-time hourly employees (the "<u>FT Hourly Employees</u>"), and 28 part-time hourly employees (the "<u>PT Hourly Employees</u>" and, together with the FT Hourly Employees, the "<u>Hourly Employees</u>," and, together with the Salaried Employees, the "<u>Employees</u>").  The Employees are paid every other week on Fridays for their services in the preceding period of Sunday through Saturday of the prior two weeks.  Payroll is funded through Paychex, Inc. ("<u>Paychex</u>").  IEC funds the payroll by disbursing funds from its bank account to Paychex on Wednesdays or Thursdays of each payroll week in the amount required for that upcoming payroll date.

37.      The Employees perform a variety of critical functions for IEC, including positions relating to operations, maintenance, management, customer service, inventory, and cash registry.  The Employees' skills, knowledge, and understanding of IEC's business, products, assets, customers, and operations are essential to the effective operation of IEC's business and to a successful reorganization that maximizes value for parties-in-interest of IEC's estate.  IEC also operates its business in an area in which finding new employees historically has been

---

[12] As of the Petition Date, Galley did not have any employees.

challenging, thus making retention of Employees vitally important to continued operations and this reorganization.

38.     In addition to the Employees, IEC also has entered into a consulting arrangement with the Cooperative Development Institute for the consulting services of Rob Brown ("Brown") as an independent contractor on an hourly basis.  Brown provides IEC with education, training, and technical assistance to: (1) improve human resource management, leadership, systems, and communication, and (2) develop the board of directors and improve clarity around board roles and responsibilities.  Brown performs the services at a rate of **$90.00** per hour, with time billed at the end of each month.  As of the Petition Date, I understand that Brown was paid in full for any services provided.

39.     IEC also utilizes the bookkeeping and related accounting services of Ed Lucerne of Specialized Accounting Service ("Lucerne" and, together with Brown, the "Independent Contractors").  I understand that IEC seeks to continue having Lucerne provide bookkeeping, data entry, and similar types of internal accounting and financial services as an independent contractor during the case.[13]  Lucerne performs these services at a rate of **$480.00** per week, billed weekly.  Due to the timing of the Debtors' filings, I understand that Lucerne will have a claim against IEC for approximately one week's work before the Petition Date.

40.     I understand that IEC does not seek to modify the foregoing retention terms or agreements of the Independent Contractors in any way through the Payroll Motion, but seeks to pay its obligations to the Independent Contractors in the ordinary course during the chapter 11 case, including to the extent of any Independent Contractor Obligations.

---

[13] Prepetition, Lucerne provided broader accounting and financial reporting services for IEC, acting as its primary outside account.  However, during the case, the Debtors are seeking authority to have Spinglass to provide accounting and reporting services, rather than Lucerne (subject to this Court's approval).  Thus, in the case, Lucerne will serve effectively in the role of an in-house bookkeeper or controller for the Debtor, at a much lower cost to the estate than hiring someone internally.

41.     Just as IEC depends on the Employees to operate its businesses on a daily basis, the Employees also depend on IEC.  Indeed, I understand that many of these individuals and their families rely on payments received from IEC for their basic living necessities.  In an effort to minimize the personal hardship to the individuals and to maintain morale and stability in IEC's business operations during this critical juncture, IEC seeks authority to continue to pay and honor (subject to applicable Orders of this Court and the Bankruptcy Code) amounts arising under or in connection with IEC's obligations to the Employees.

42.     I also understand that IEC participates in, or is obligated under, a number of different wage, salary, consulting, and benefit structures, programs, and plans, all as more particularly described in the Payroll Motion.  I have reviewed the Payroll Motion, and to the best of my information and belief, the factual statements and descriptions in the Payroll Motion are true and accurate as of the Petition Date, including as to the Employee Compensation Obligations, Payroll Obligations, and Employee Benefits and the amounts due and owing in regard thereof.

43.     In particular, the gross payroll for the Hourly Employees on the next pay date is projected to be not more than **$55,800.00**, and gross payroll for Salaried Employees on that date is projected to be not more than **$4,200.00**.  Because payroll on October 1 will be for services previously provided from September 12 to September 25, a portion of the Employee Compensation Obligations paid then will constitute compensation for prepetition services provided by the Employees.

44.     I believe that IEC's ability to fund the Employee Obligations and maintain the Employee Benefits is indispensable to the reorganization of IEC's businesses.  The Employees' and Independent Contractors' morale directly affects their effectiveness and productivity, and in

turn IEC's effectiveness and productivity. I believe that it is critical that IEC continues, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date, all as detailed in the Payroll Motion. If such obligations are not timely paid postpetition, Employees likely would suffer extreme personal hardship, may be unable to pay their daily living expenses, and may discontinue their employment with the Debtor. A loss of workforce morale and goodwill at this juncture would undermine the Debtor's stability, damage community relations, and, undoubtedly, would have an adverse effect on the Debtor, its customers, the value of the Debtor's assets and businesses, and its ability to achieve its objectives in its chapter 11 case. Thus, I believe that the imminent relief requested in the Payroll Motion is necessary to IEC's success in these cases.

**D.     MOTION OF DEBTOR FOR ENTRY OF AN ORDER: (I) PROHIBITING UTILITY PROVIDERS FROM ALTERING, REFUSING, OR DISCONTINUING SERVICES; (II) APPROVING THE FORM OF ADEQUATE ASSURANCE PROPOSED BY THE DEBTOR; AND (III) ESTABLISHING PROCEDURES FOR RESOLVING ADDITIONAL ADEQUATE ASSURANCE REQUESTS (the "<u>Utilities Motion</u>")**[14]

45.     I understand that through the Utilities Motion, IEC[15] seeks authority to provide certain assurances of payment to utility provides and for this Court to establish certain procedures related to ensuring uninterrupted utility services for IEC in chapter 11.

46.     IEC operates three primary businesses in Deer Isle, Maine: Burnt Cove Market, The Galley Grocery, and V&S Variety. In the ordinary course, each business receives certain utility services (collectively, the "<u>Utility Services</u>") from certain utility providers (collectively, the "<u>Utility Providers</u>") to sustain operations at the locations, as listed in the Utilities Motion.

---

[14] The Debtors do not seek a hearing regarding the Utilities Motion on an emergency basis.

[15] Although Galley owns the real estate at which IEC operates its businesses, I understand that the applicable utility accounts are in the name of IEC only.

47.     Uninterrupted Utility Services are essential for IEC to maintain its operations. Any interruption in Utility Services, even for a brief period of time, would severely, and potentially irreparably, disrupt IEC's operations and jeopardize its reorganization efforts. Accordingly, it is critical to the success of the chapter 11 case and in the best interests of creditors that the Utility Services continue without interruption during the case.

48.     IEC pays a total of approximately **$12,358.99** each month for Utility Services, which amount is based on the average monthly invoices for the Utility Providers over the approximately twelve-month period before the Petition Date.  Further details about these bills are included in the Utilities Motion.  IEC anticipates that the costs of Utility Services during the pendency of the case will be roughly consistent with prepetition costs, subject to any operational changes or asset sales that may occur (with such changes also subject to this Court's approval to the extent set forth in the Bankruptcy Code).

49.     IEC intends to pay its postpetition obligations, including those owed to the Utility Providers, in a timely manner.  I believe that IEC's funds on hand and revenue generated from future business operations, along with ongoing cash collateral authority, will provide sufficient liquidity to pay the postpetition obligations related to the Utility Services on a timely basis.  In addition, I believe that IEC's reliance on the Utility Services for the operation of its businesses is a powerful incentive to stay current on its utility obligations.  To provide additional assurance of payment to the Utility Providers I understand that IEC proposes depositing the amount of **$6,179.50** into a segregated deposit account within thirty (30) days of the Petition Date.  The Adequate Assurance Deposit constitutes 50% of the aggregate monthly average invoices for the Utility Services.

50.     IEC has made a good-faith effort to identify all entities that are Utility Providers and include them on the Utility Service List.

51.     In sum, I believe that the Adequate Assurance Procedures are necessary for IEC to implement its chapter 11 strategy without unnecessary and costly disruptions on account of discontinued Utility Services.  If the Adequate Assurance Procedures are not approved, IEC may be confronted with and forced to address numerous requests for adequate assurance of payment from their Utility Providers at a critical time for its organization.   Moreover, IEC could be blindsided by a Utility Provider alleging that it is not adequately protected, and, therefore, either is entitled to make an exorbitant demand for payment to continue providing service or discontinue providing service to IEC altogether.   Such an outcome would jeopardize IEC's ability to successfully reorganize.

E.     **MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO ENTER INTO AND ASSUME THAT CERTAIN RESTRUCTURING SUPPORT AGREEMENT BETWEEN (I) THE DEBTORS; AND (II) COASTAL ENTERPRISES, INC., COOPERATIVE FUND OF NEW ENGLAND, INC., AND NATIONAL COOPERATIVE BANK, N.A. (the "RSA Motion")**[16]

52.     I understand that through the RSA Motion, the Debtors seek authorization to enter into and assume the RSA to ensure that the Debtors' restructuring is effectuated as planned.  A copy of the RSA is attached to the RSA Motion.

53.     Throughout the process that has led to the restructuring of the Debtors contemplated through these cases and under the terms of the RSA, the Debtors and the Consenting Lenders—which hold blanket, first-position liens on all of the Debtors' assets—have sought to protect and improve the operational stability and financial viability of the Debtors and their core assets and businesses.  I believe that the need to protect and maintain the assets and

---

[16] The Debtors do not seek an emergency hearing on the RSA Motion.

businesses during the restructuring process, in order to both preserve their value for creditors and other stakeholders and to enable the Debtors to continue to provide uninterrupted operations for their customers, has heightened the need for compromise and collaboration among the Debtors' major constituencies.

54.   I believe that the successful future operations and financial stability of the Debtors may depend on, among other things: (a) the willingness of the Consenting Lenders to refinance their matured, prepetition loans with the Debtors and provide exit financing in relation to the cases; (b) the willingness of other parties, including customers, vendors, and the community, to support the businesses and continue to do business with the Debtors; and (c) the Debtors' ability to reorganize their businesses and restructure their liabilities as quickly, efficiently, and cost-effectively as possible to ensure that resources are preserved and available to the maximum extent possible to fund operations, capital improvements, debt service, and other necessary present and future expenses.

55.   To accomplish their restructuring goals, in the months leading up to the Petition Date, the Debtors approached the Consenting Lenders about a strategy to refinance the Senior Debt Obligations,[17] all which matured in June 2021.  The Debtors also sought the support of the Consenting Lenders for the restructuring process overall, including because the Debtors recognized that the Consenting Lenders, which hold a significant portion of the Debtors' prepetition debt (including the first three senior liens), would be a critical constituency in any restructuring proceeding.  Once more, the Debtors determined that their ability to achieve a timely, efficient, and cost-effective reorganization would be significantly improved by negotiating with the Consenting Lenders and agreeing to critical terms in advance of

---

[17] Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to such terms in the RSA.

commencing any cases.  The Debtors also anticipated that a consensual reorganization would be important to maintaining public relations and community support through the process, in addition to managing administrative expenses.

56.    Thus, to preserve and improve the value of the Debtors' assets and businesses, the Debtors undertook significant efforts in the weeks prior to the Petition Date—including extensive, good-faith negotiations—to develop a broad plan for the restructuring with the support of the Consenting Lenders and to minimize the impact from the restructuring on the businesses.

57.    The RSA represents the culmination of the efforts between the Debtors and the Consenting Lenders.  Among other things, and as detailed further below, the RSA sets forth: (i) the terms on which the Consenting Lenders have agreed to refinance the Senior Debt Obligations through a plan of reorganization; (ii) the terms on which the Debtors may use the Consenting Lenders' cash collateral during the cases; and (iii) an agreed-upon timeline for expeditiously moving the cases toward confirmation of plans of reorganization and exiting Chapter 11.  As a result, not only will the Debtors and creditors benefit from the terms of the RSA, but I also believe that the estates will enjoy significant cost-savings during the restructurings because the Debtors have already negotiated some of the most important issues in any Chapter 11 case with their three senior lienholders.

58.    I believe that the restructurings upon the terms in the RSA and with the support of the Consenting Lenders will allow the Debtors to minimize negative consequences to the assets and the businesses in the cases and will provide the best, most cost-effective path to preservation of going-concern value for all stakeholders.

59.    The prospect of any bankruptcy poses risk to a debtor and its businesses, including because of the uncertainties in the process and the public perceptions associated with

bankruptcy.  I believe that emerging from these cases quickly and with a viable exit plan (that will include refinancing nearly $3 million in senior, secured debt) is the best way to avoid a prolonged restructuring process.  Further, I believe that the Debtors' prepetition efforts to negotiate critical terms with the Consenting Lenders will help preserve the value of the Debtors' assets and businesses by reducing administrative expenses and increasing the chances of consensually confirming plans of reorganization.

60.     The RSA, therefore, is the lynchpin of the Debtors' efforts toward a consensual restructuring, providing the roadmap to the Debtors' successful emergence from chapter 11.  The RSA, moreover, represents a favorable solution to the Debtors' largest financial challenges (i.e., the matured senior debt) and is, importantly, supported by the Debtors' largest secured creditors. The collective goal of the Consenting Lenders and the Debtors is for the Debtors to emerge from chapter 11 as quickly as possible, with a minimum impact on day-to-day operations, an improved balance sheet, and a financially stable future.  I believe that assuming the RSA is a crucial step to achieving these goals.

61.     In addition, although the RSA plainly and intentionally imposes new obligations under the Debtors in these cases (e.g., case milestones and deadlines above those in the Bankruptcy Code), I also believe that the negotiated agreements in the RSA with the Consenting Lenders are fair and reasonable.  Locking up this broad support through the RSA will help the Debtors expeditiously emerge from chapter 11, reduce business disruption, and avoid an extended chapter 11 process with its significant associated risks and costs, all of which will benefit the Debtors' creditors and other stakeholders.

62.     Finally, the Debtors only entered into the RSA after several weeks of intensive negotiations with the Consenting Lenders and a robust process that included input and direction

from the Debtors' boards of directors and their experienced restructuring professionals, including legal counsel and financial advisors. Based upon extensive negotiations around the various alternatives to the transactions embodied in the RSA, and taking into account the heightened risks and costs for a non-consensual chapter 11 process, I believe that it is the Debtors' sound business judgment that the final terms of the RSA, reached only after hard-fought, arm's-length negotiations, represent the best restructuring path available for the Debtors and are, more generally, consistent with the goals of subchapter V.

**F.     MOTIONS OF THE DEBTORS FOR EXTENSION OF TIME FOR THE DEBTORS TO FILE SCHEDULES AND STATEMENT OF FINANCIAL AFFAIRS (the "Schedules and Statement Motions")**[18]

63.     I understand that through the Schedules and Statement Motions, the Debtors seek to extend the time for filing their Schedules and Statements by seven (7) days, or from October 7, 2021, to October 14, 2021.

64.     I believe that under the circumstances of this chapter 11 case, sufficient cause exists to extend the deadline to file the Schedules and Statements. Completing the Schedules and Statements for both Debtors requires considerable time and effort to collect, review, and assemble information, in addition to attending to operations and the day-to-day demands of the chapter 11 process. Before the Petition Date, the Debtors focused primarily on negotiating the RSA with the Consenting Lenders, preparing the necessary pleadings to commence the case, and engaging in negotiations with its advisors and other parties in interest. Given the amount of work entailed in completing the Schedules and Statements for the Debtors and the competing demands upon the IEC's small team of personnel to address critical operational and Chapter 11 administrative matters during the initial postpetition period, I do not believe that the IEC's team

---

[18] Each Debtor filed a separate Schedules and Statement Motion. The Debtors seek a determination on the Schedules and Statements Motions without a hearing under the Local Rules.

can properly and accurately complete the Schedules and Statements for both Debtors within the required period.

65.     I recognize the importance of the Schedules and Statements, particularly as the Debtors moves toward filing their plans of reorganization, and I understand that the Debtors intend to complete the Schedules and Statements as quickly as possible under the circumstances.

**G.     MOTION OF DEBTOR FOR ENTRY OF AN ORDER, ON AN INTERIM AND THEN FINAL BASIS, AUTHORIZING, BUT NOT DIRECTING, DEBTOR TO PAY PREPETITION CLAIMS OF CERTAIN CRITICAL VENDORS (the "<u>Critical Vendors Motion</u>")**

66.     I understand that through the Critical Vendors Motion, IEC[19] seeks authority to pay prepetition claims of the Critical Vendors.

67.     Prior to the Petition Date, and in the ordinary course of business, IEC operated the Stores.  The Galley and BCM are both grocery stores, and V&S is a retail store selling a wide range of items, including greeting cards, fabric, yard goods, house wares, small appliances, clothes, and everyday hardware.

68.     An integral component of operating the Stores is the efficient flow of inventory and products to and from the Stores.  Accordingly, IEC relies on the Critical Vendors—which include certain common commercial carriers and other third-party vendors and service providers—identified on **<u>Exhibit A</u>** attached to the Critical Vendors Motion.  These Critical Vendors provide and deliver essential inventory, materials, and other products used in IEC's ordinary course of operations for resale to customers, including, in many instances, deliveries that arrive on a daily or near-daily basis.  As such, the Critical Vendors maintain possession of products vital to IEC's continued operations and overall reorganization.  Indeed, it almost goes without saying that a grocery store or a hardware store cannot operate—and will

---

[19] As of the Petition Date, Galley did not have any critical vendors with prepetition claims.

suffer significant and immediate financial and reputational harm—if it does not maintain a steady and robust inventory for customers.

69.     As of the Petition Date, due to the timing of deliveries and invoicing, many of the Critical Vendors will have claims for inventory, goods, and related services provided to IEC prior to the Petition Date (the "Critical Vendor Claims").[20]   If IEC fails to pay the Critical Vendor Claims, IEC believes that the Critical Vendors may stop providing their essential services to it, may demand different trade terms, and otherwise may take steps that disrupt the highly coordinated inventory and stocking system maintained by the Debtors for the Stores.

70.     I believe that any such interruption in obtaining the services and cooperation of the Critical Vendors would: (i) delay necessary shipments of goods to the Stores, (ii) undermine IEC's ability to maintain the selection of inventory at the Stores necessary to retain customer loyalty and a positive reputation in the community (and thus impair IEC's ability to generate ongoing operating revenue), and (iii) adversely and irreparably affect IEC's ability to operate on a post-petition basis and reorganize.  Moreover, even if suitable alternative vendors are available (itself a dubious proposition given IEC's location), the time necessary to identify replacement providers and integrate them into IEC's operations would cause an immediate, significant, and irreparable disruption to the IEC's operations and cash flow.  During any such transition period, IEC would lose access to valuable goods held by the Critical Vendors, would face inventory shortages, and would suffer immediate harm.

71.     IEC needs to be able to assure its customers, vendors, and employees that, notwithstanding the filing of this chapter 11 case, IEC will nonetheless be able to provide

---

[20] Because the Critical Vendors deliver products almost every day and those deliveries vary in quantity and cost to IEC, and because the Critical Vendors sometimes do not invoice IEC immediately upon delivery, IEC is unable to provide an exact value of the Critical Vendor Claims as of the Petition Date.  IEC, therefore, has attempted to estimate those claims based on historic and anticipated practices.

customers with high-quality products at the Stores.  Further, IEC operates the only large grocery stores on Deer Isle, and the residents rely upon its continued operations.  IEC, like all grocery store operators, must keep a large variety of goods readily available to satisfy customer demands.  Any interruption in the supply of services and products with be harmful to IEC's businesses and to its customer base.

72.     To maintain consistency and keep its businesses running efficiently and seamlessly, IEC has developed a purchasing, inventory, and delivery system that relies significantly on third parties to supply IEC with food and beverage products, material goods, and supplies, and to provide other essential services.  It is necessary that IEC maintain its business relationships with, and honor outstanding payment obligations to, these key vendors and service providers—the Critical Vendors—in light of the role that they play in the day-to-day in IEC's businesses.  Thus, to prevent the commencement of the chapter 11 case from causing an unexpected or inopportune interruption to its business operations, I understand that IEC is seeking authority to pay Critical Vendor Claims, almost all of which operate without contracts, as needed to ensure IEC's continued receipt of goods and services, and favorable credit terms, from the Critical Vendors.

73.     To identify the Critical Vendors, IEC reviewed its accounts payable and prepetition vendor lists to identify those vendors likely to have prepetition claims that are most essential to IEC's operations pursuant to the following criteria: (i) whether certain quality specifications or other requirements of IEC's customers prevent IEC from obtaining a vendor's products or services from alternative sources within a reasonable timeframe, including difficulties in sourcing inventory given IEC's isolated location; (ii) whether, if a vendor is not a single source supplier, IEC has sufficient product in inventory to continue its operations while a

replacement vendor is put in place, if required; (iii) whether a vendor meeting the foregoing criteria is able or likely to refuse to ship product to IEC postpetition if its prepetition balances are not paid; and (iv) the likelihood and scale of the immediate and irreparable harm that IEC and its estate would suffer if a vendor ceased deliveries, delayed deliveries, renegotiated trade terms, or otherwise acted to disrupt the flow of inventory that existed before the Petition Date.

74.    Although it is difficult to estimate with precision the value of the outstanding Critical Vendor Claims on the Petition Date, IEC has estimated, with the information presently available, the amount of the outstanding Critical Vendor Claims, as shown on **Exhibit A** to the Critical Vendors Motion.[21]

75.    I believe that the goods and services provided by the Critical Vendors are necessary to ensure that there are not any unexpected or inopportune interruptions to IEC's businesses because the Critical Vendors are the most cost-efficient and, in many cases, the only, source from which IEC can procure critical goods and services within a timeframe that would permit IEC to avoid interruptions, delays, or shutdowns in its operations and inventory stock. Also, certain of IEC's distributors maintain exclusive distribution rights to its particular geographic area, such that IEC is essentially required to use these particular vendors. I believe that any failure to pay the Critical Vendor Claims would result in the Critical Vendors refusing to provide necessary goods and services to IEC, delaying deliveries, and/or renegotiating trade terms. I believe that any unexpected or inopportune interruption, delay, or shutdown in IEC's operations resulting from a refusal by the Critical Vendors to do business with IEC on a postpetition basis, or IEC's inability to maintain a full and replenishable stock of goods at all

---

[21] It is possible that certain deliveries may be less expensive than anticipated, or some or all of a vendor's deliveries included in a Critical Vendor Claim actually occur on or after the Petition Date. In that situation, the Critical Vendor Claim amount may be reduced.

times, would have disastrous effects on IEC's businesses, and undermine IEC's ability to preserve and maximize the value of its estate.

76.     I believe that authority to pay the Critical Vendor Claims is vital to its efforts to preserve and maximize the value of IEC's estate.  If the proposed interim order is not entered, I believe that many of the Critical Vendors will refuse to do business with IEC, will delay deliveries, and/or will attempt to renegotiate trade terms that are less favorable to IEC. Such a result would immediately and irreparably damage IEC's efforts to successfully prosecute this chapter 11 case and would distract from IEC's other ongoing efforts in this case, to the detriment of IEC's estate and creditors, and would also result in harm to its community that relies on IEC to provide essential and desirable goods.  Indeed, I believe that IEC's failure to maintain a robust inventory at any time could have an immediate impact on its reputation, raise concerns about its business viability, and otherwise unnecessarily disrupt its reorganization plans.

77.     For the foregoing reasons, I respectfully submit that entry of the proposed interim order granting the Critical Vendors Motion is in the best interests of IEC, its estate, and creditors.

*[The remainder of this page is intentionally left blank]*

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: _____, 2021

Kristy Wiberg
*President and Authorized Party*