**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>**THE ISLAND EMPLOYEE COOPERATIVE, INC.,**[1]<br><br>　　　　　Debtor. | Chapter 11<br><br>Case No. 21-10253 |

| | |
|---|---|
| In re:<br><br>**THE GALLEY,**[2]<br><br>　　　　　Debtor. | Chapter 11<br><br>Case No. 21-10254 |

**MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO ENTER INTO AND ASSUME THAT CERTAIN RESTRUCTURING SUPPORT AGREEMENT BETWEEN: (I) THE DEBTORS; AND (II) COASTAL ENTERPRISES, INC., COOPERATIVE FUND OF NEW ENGLAND, INC., AND NATIONAL COOPERATIVE BANK, N.A.**

The Island Employee Cooperative, Inc. ("IEC") and The Galley ("Galley" and, together with IEC, the "Debtors"), by and through undersigned proposed counsel, hereby move this Court (the "Motion") for entry of an order authorizing the Debtors to enter into, assume, and perform obligations under that certain Restructuring Support Agreement (including all amendments, exhibits, and schedules thereto, the "RSA"), a copy of which is attached to this Motion as **Exhibit A**, among: (i) the Debtors; and (ii) Coastal Enterprises, Inc. ("CEI"); Cooperative Fund of New England, Inc. ("CFNE"); and National Cooperative Bank, N.A. ("NCB" and, together

---

[1] The last four digits of The Island Employee Cooperative, Inc.'s federal taxpayer identification number are 6823. See 11 U.S.C. § 342(c)(1). The principal place of business for The Island Employee Cooperative, Inc. and The Island Employee Cooperative, Inc.'s address is 1 Burnt Cove Road, Stonington, Maine 04681.

[2] The principal place of business for The Galley and The Galley's address is 1 Burnt Cove Road, Stonington, Maine 04681.

1

with CEI and CFNE, the "Consenting Lenders"). In support of this Motion, the Debtors state as follows:

## JURISDICTION, VENUE AND PREDICATES FOR RELIEF

1. The United States District Court for the District of Maine (the "District Court") has original, but not exclusive, jurisdiction over the Debtors' chapter 11 cases pursuant to 28 U.S.C. § 1334(b). Pursuant to 28 U.S.C. § 157 and Rule 83.6 of the District Court's local rules, the District Court has authority to refer and has referred this proceeding to this Court.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court has constitutional authority to enter final judgment in this proceeding.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1408, and venue over this proceeding is proper in this district pursuant to 28 U.S.C. § 1409.

4. The statutory and other predicates for the relief requested herein include §§ 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

5. On September 23, 2021, the Debtors commenced their chapter 11 cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code with this Court.

6. The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to §§ 1007(a) and 1108 of the Bankruptcy Code. To date, no operating trustee, examiner, or statutory committee has been appointed in the cases by the United States Trustee.

7. A description of the Debtors' capital and corporate structures, businesses, and the events leading to the commencement of these chapter 11 cases, as well as the facts and circumstances supporting this Motion, are set forth in the *Declaration of Kristy Wiberg in*

*Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), which was filed contemporaneously herewith and is incorporated herein by reference.

### A. Factual Background Regarding The Debtors' Entry Into The RSA.

8. Throughout the process that has led to the restructuring of the Debtors contemplated through these cases and under the terms of the RSA, the Debtors and the Consenting Lenders—which hold blanket, first-position liens on all of the Debtors' assets—have sought to protect and improve the operational stability and financial viability of the Debtors and their core assets and businesses. The need to protect and maintain the assets and businesses during the restructuring process, in order to both preserve their value for creditors and other stakeholders and to enable the Debtors to continue to provide uninterrupted operations for their customers, has heightened the need for compromise and collaboration among the Debtors' major constituencies. Indeed, while compromise and key constituent support are at the forefront of any successful Chapter 11 reorganization, those values are particularly important—and, often, necessary—in the context of subchapter V small business reorganizations, where Congress intended to promote efficient and cost-effective restructurings for small businesses just like the Debtors are attempting here.

9. As set forth in the First Day Declaration, and as described in greater detail herein, the successful future operations and financial stability of the Debtors may depend on, among other things: (a) the willingness of the Consenting Lenders to refinance their matured, prepetition loans with the Debtors and provide exit financing in relation to the cases; (b) the willingness of other parties, including customers, vendors, and the community, to support the businesses and continue to do business with the Debtors; and (c) the Debtors' ability to reorganize their businesses and restructure their liabilities as quickly, efficiently, and cost-effectively as possible

to ensure that resources are preserved and available to the maximum extent possible to fund operations, capital improvements, debt service, and other necessary present and future expenses.

10. To accomplish their restructuring goals, in the months leading up to the Petition Date, the Debtors approached the Consenting Lenders about a strategy to refinance the Senior Debt Obligations,[3] all which matured in June 2021. The Debtors also sought the support of the Consenting Lenders for the restructuring process overall, including because the Debtors recognized that the Consenting Lenders, which hold a significant portion of the Debtors' prepetition debt (including the first three senior liens), would be a critical constituency in any restructuring proceeding. Once more, the Debtors determined that their ability to achieve a timely, efficient, and cost-effective reorganization would be significantly improved by negotiating with the Consenting Lenders and agreeing to critical terms in advance of commencing any cases. The Debtors also anticipated that a consensual reorganization would be important to maintaining public relations and community support through the process, in addition to managing administrative expenses.

11. Thus, to preserve and improve the value of the Debtors' assets and businesses, the Debtors undertook significant efforts in the weeks prior to the Petition Date—including extensive, good-faith negotiations—to develop a broad plan for the restructuring with the support of the Consenting Lenders and to minimize the impact from the restructuring on the businesses.

12. The RSA represents the culmination of the efforts between the Debtors and the Consenting Lenders. Among other things, and as detailed further below, the RSA sets forth: (i) the terms on which the Consenting Lenders have agreed to refinance the Senior Debt Obligations through a plan of reorganization; (ii) the terms on which the Debtors may use the Consenting

---

[3] Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to such terms in the RSA.

4

Lenders' cash collateral during the cases; and (iii) an agreed-upon timeline for expeditiously moving the cases toward confirmation of plans of reorganization and exiting Chapter 11. As a result, not only will the Debtors and creditors benefit from the terms of the RSA, but the Debtors also believe that the estates will enjoy significant cost-savings during the restructurings because the Debtors have already negotiated some of the most important issues in any Chapter 11 case with their three senior lienholders.

13. In sum, the Debtors believe that the restructurings upon the terms in the RSA and with the support of the Consenting Lenders will allow the Debtors to minimize negative consequences to the assets and the businesses in the cases and will provide the best, most cost-effective path to preservation of going-concern value for all stakeholders.

14. Accordingly, the Debtors, in their sound business judgment, seek to enter into and assume the RSA to ensure that the restructuring is effectuated as planned, and they respectfully request that this Court approve such assumption and grant the relief sought in this Motion.

### B. The RSA And Its Material Terms

#### i. *Material Terms of the RSA*

15. A non-exhaustive summary of the material terms of the RSA is set forth as follows:[4]

| Category | Term | Location in RSA |
|---|---|---|
| **Case Milestones and Deadlines** | Commencement of the Chapter 11 Cases. Each Debtor hereby agrees that, as soon as reasonably practicable, but in no event later than September 23, 2021, such Debtor shall file with the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Case of such Debtor. | Sections 3 and 4 |
| | Filing of the Plan. Not more than thirty (30) days after the Petition Date, the Debtors shall file the Plan with the | |

---

[4] The descriptions contained herein are qualified in their entirety by the specific terms and conditions of the RSA. To the extent there exists any inconsistency between these summaries and the RSA, the RSA shall control.

| | | |
|---|---|---|
| | Bankruptcy Court upon terms consistent with this Agreement, which such Plan shall provide, *inter alia*, for refinancing the Loans upon the terms set forth in the Term Sheet (which such refinancing also subject to mutually acceptable Definitive Documentation). The Debtors shall provide a draft of the Plan to the Consenting Lenders not later than fifteen (15) days after the Petition Date. | |
| | Confirmation of the Plan. Each Debtor shall use its commercially reasonable efforts to obtain confirmation of the Plan as soon as reasonably practicable following the Petition Date in accordance with the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and the Local Rules, and on terms consistent with this Agreement, and each Consenting Lender shall use its commercially reasonable efforts to cooperate fully in connection therewith. The Parties desire for confirmation of the Plan to occur not later than December 31, 2021, with the understanding that timing of confirmation may vary based on numerous factors. | |
| | Assumption of the Agreement. Not later than five (5) days after the Petition Date, the Debtors shall file a motion with the Bankruptcy Court seeking authorization to assume this Agreement under section 365 of the Bankruptcy Code. | |
| **Plan Treatment for Consenting Lenders / Refinancing** | Due to the number of terms associated with the refinancing, see Exhibit A (Term Sheet) to the RSA for specific terms. | Exhibit A to RSA |
| **Cash Collateral Terms for Consenting Lenders** | The Debtors' proposed interim and final cash collateral orders shall contain, at minimum, the following terms and conditions as to the Consenting Lenders, provided, however, that certain of the terms set forth below may be granted by the Bankruptcy Court only on a final basis, which the Consenting Lenders acknowledge:<br>• Stipulation as to debt amount owed to each Consenting Lender as of the Petition Date, without offset, defenses, etc.;<br><br>• Stipulation as to priority and validity of the liens granted to each Consenting Lender as of the Petition Date;<br><br>• Waiver of the Debtors' surcharge rights under section 506(c) of the Bankruptcy Code;<br><br>• Waiver of the Debtors' rights under section 552(b) of the Bankruptcy Code and acknowledgement that Consenting Lenders are entitled to continuing liens under section 552(b);<br><br>• Obligation by the Debtors to provide weekly variance reporting on the Thursday of each week for the | |

6

| | | |
|---|---|---|
| | prior Sunday to Saturday period; | |
| | • Adequate protection to the Consenting Lenders in the form of replacement liens, continuing liens, and super priority administrative expense claims to the extent of any diminution in the value of a Consenting Lender's interest in cash collateral after the Petition Date; | |
| | • Approved budget and obligation of Debtors to use cash collateral in accordance with such budget, subject to agreed upon variance (not less than 110%) and acknowledgement that timing of revenue and disbursements may vary from budget; and | |
| | • The Debtors shall make interest-only adequate protection payments to the Consenting Lenders starting on November 1, 2021 and on the first of each month thereafter until confirmation of the Chapter 11 plan(s), in the following amounts: (i) CEI = $3600/month; (ii) NCB = $6,175/month; and (iii) CFNE = $2,783.28/month. | |
| **Obligations of Consenting Lenders** | So long as this Agreement has not been terminated in accordance with the terms hereof, each Consenting Lender agrees that it shall, subject to the receipt by such Consenting Lender of the solicitation materials in respect of the Plan:<br><br>(i) timely vote or cause to be voted, all of its claims against the Debtors to accept the Plan by delivering its duly executed and completed ballots accepting the Plan on a timely basis following the commencement of the Solicitation; <u>provided</u> that such vote and release may be immediately revoked and deemed void *ab initio* by such Consenting Lender upon termination of this Agreement prior to the confirmation of the Plan pursuant to the terms hereof;<br><br>(ii) not change, revoke, or withdraw (or cause to be changed, revoked, or withdrawn) any such vote or release described in clause (i) above;<br><br>(iii) not (A) object to, delay, postpone, challenge, reject, oppose, impede, or take any other action that would reasonably be expected to prevent, interfere with, delay or impede, directly or indirectly, in any material respect, the approval, acceptance, or implementation of the Restructuring on the terms set forth in the Plan, (B) directly or indirectly solicit, encourage, propose, file with the Bankruptcy Court, support, participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout, proposal or offer of dissolution, winding up, liquidation, or plan of reorganization for any of the Debtors other than the | Section 5 |

7

| | | |
|---|---|---|
| | Plan, or (C) otherwise take any action that could in any material respect interfere with, delay, or postpone the consummation of the Restructuring; and<br><br>(iv) support and take all commercially reasonable actions necessary or reasonably requested by the Debtors to facilitate the Solicitation and confirmation and consummation of the Plan (it being understood that the Consenting Lenders shall not be required to incur any costs, expense, or liability in connection therewith).<br><br>Forbearance. During the period commencing on the date of the RSA and ending on the termination of this Agreement in accordance with its terms, each Consenting Lender hereby agrees to forbear from the exercise of any rights or remedies it may have under or related to the Loans or any other document and under applicable United States or foreign law or otherwise, in each case, with respect to any of the existing or anticipated defaults or events of default. | |
| **Obligations of the Debtors** | In addition to the deadlines for various filings, the refinancing terms, and the cash collateral terms disclosed herein, the Debtors agree to: (i) act in good faith and use commercially reasonable efforts to support and successfully complete the Reorganization in accordance with the terms of this Agreement; and (ii) do all things reasonably necessary and appropriate in furtherance of confirming the Plan and consummating the Restructuring in accordance with, and within the time frames contemplated by, this Agreement, in each case to the extent consistent with, upon the advice of counsel, the fiduciary duties of the boards of directors, managers, members, or partners, as applicable, of each Debtor. | Section 6 |
| **Termination and Default** | Termination of Agreement.<br><br>(a) This Agreement shall automatically terminate three (3) business days following the delivery of written notice to the other Parties at any time after a Termination Event (as defined below), <u>except</u> to the extent such longer notice is required herein.<br><br>(b) This Agreement shall automatically terminate immediately upon entry of the Confirmation Order.<br><br>(c) This Agreement and the obligations hereunder may be terminated by mutual agreement of the Debtors and the Consenting Lenders in writing at any time.<br><br>(d) A "**Termination Event**" shall mean | Section 7 |

8

any of the following:

(i) The breach in any material respect by either Debtor or a Consenting Lender of any of the undertakings, representations, warranties, or covenants set forth herein which remains uncured for a period of five (5) business days after the receipt of written notice of such breach;

(ii) The Debtors fail to file their petitions on or before the deadline set forth herein, unless such deadline is extended with the written consent of the Consenting Lenders;

(iii) The Debtors fail to file their motion with the Bankruptcy Court seeking authorization to assume this Agreement under section 365 of the Bankruptcy Code on or before the deadline set forth herein, unless such deadline is extended with the written consent of the Consenting Lenders, or the Bankruptcy Court denies such motion;

(iv) The Debtors fail to file the Plan on or before the deadline set forth herein, unless such deadline is extended with the written consent of the Consenting Lenders;

(v) The Bankruptcy Court does not enter an order in form and substance reasonably satisfactory to the Debtors and the Consenting Lenders confirming the Plan;

(vi) The Debtors withdraw the Plan or file any motion or pleading with the Bankruptcy Court that is not consistent with this Agreement and such motion or pleading has not been withdrawn prior to the earlier of: (A) two (2) business days after the Debtors receive written notice from the Consenting Lenders that such motion or pleading is inconsistent with this Agreement; or (B) entry of an order of the Bankruptcy Court approving such motion or pleading, <u>unless</u> otherwise agreed to in writing by the Consenting Lenders;

(vii) An examiner with expanded powers or a trustee (other than the subchapter V trustee) shall have been appointed in the Chapter 11 Cases without the prior written consent of the Consenting Lenders. Said consent may be withheld or delayed in the Consenting Lenders' sole discretion.

(viii) The Debtors file, propound, or otherwise support any Chapter 11 plan that is inconsistent with this Agreement in any material respect without the prior written consent of the

|  |  |  |
|---|---|---|
|  | Consenting Lenders. Said consent may be withheld or delayed in the Consenting Lenders' sole discretion.

(ix)    The Debtors grant or consent to any liens in the Chapter 11 Cases equal or senior to the liens of the Consenting Lenders securing the Loans without the prior written consent of the Consenting Lenders. Said consent may be withheld or delayed in the Consenting Lenders' sole discretion.

(x)    Dismissal of either of the Chapter 11 Cases or conversion of either Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code without the prior written consent of the Consenting Lenders. Said consent may be withheld or delayed in the Consenting Lenders' sole discretion.

(xi)    The Debtors' pursuant to the terms and conditions of any cash collateral order entered by the Court or cash collateral agreement or stipulation approved by the Court unless said default is timely cured by Debtors in accordance with the applicable cash collateral order, agreement, or stipulation.

(e)    <u>Effect of Termination</u>. Upon the termination of this Agreement in accordance with this Section, this Agreement shall become void and of no further force or effect and each Party shall, except as otherwise provided in this Agreement, be immediately released from its respective liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement, shall have no further rights, benefits, or privileges hereunder, and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, and no such rights or remedies shall be deemed waived pursuant to a claim of laches or estoppel; <u>provided</u> that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination. |  |

ii.    ***The RSA Is Necessary to Preserve the Value of the Debtors' Assets and Businesses***

16.    The prospect of any bankruptcy poses risk to a debtor and its businesses, including because of the uncertainties in the process and the public perceptions associated with bankruptcy. The Debtors believe that emerging from these cases quickly and with a viable exit

10

plan (that will include refinancing nearly $3 million in senior, secured debt) is the best way to avoid a prolonged restructuring process. Further, the Debtors believe that their prepetition efforts to negotiate critical terms with the Consenting Lenders will help preserve the value of the Debtors' assets and businesses by reducing administrative expenses and increasing the chances of consensually confirming plans of reorganization.

17. The RSA, therefore, is the lynchpin of the Debtors' efforts toward a consensual restructuring, providing the roadmap to the Debtors' successful emergence from chapter 11. The RSA, moreover, represents a favorable solution to the Debtors' largest financial challenges (*i.e.*, the matured senior debt) and is, importantly, supported by the Debtors' largest secured creditors. The collective goal of the Consenting Lenders and the Debtors is for the Debtors to emerge from chapter 11 as quickly as possible, with a minimum impact on day-to-day operations, an improved balance sheet, and a financially stable future. The Debtors believe that assuming the RSA is a crucial step to achieving these goals.

18. In addition, although the RSA plainly and intentionally imposes new obligations under the Debtors in these cases (*e.g.*, case milestones and deadlines above those in the Bankruptcy Code), the Debtors also believe that the negotiated agreements in the RSA with the Consenting Lenders are fair, reasonable, and consistent with outcomes in other similar cases and under applicable case law. For example, the Consenting Lenders have agreed to refinance their senior debt through new loans at a "market" terms such as 5.5% fixed interest rate, amortized over 20 years, with a 5-year balloon. Likewise, the cash collateral terms in the RSA are consistent with interim and final cash collateral orders in this jurisdiction and others. At the same time, locking up this broad support through the RSA will help the Debtors expeditiously emerge from chapter 11, reduce business disruption, and avoid an extended chapter 11 process

with its significant associated risks and costs, all of which will benefit the Debtors' creditors and other stakeholders.

19.     Finally, the Debtors only entered into the RSA after several weeks of intensive negotiations with the Consenting Lenders and a robust process that included input and direction from the Debtors' boards of directors and their experienced restructuring professionals, including legal counsel and financial advisors.  Based upon extensive negotiations around the various alternatives to the transactions embodied in the RSA, and taking into account the heightened risks and costs for a non-consensual chapter 11 process, it is the Debtors' sound business judgment that the final terms of the RSA, reached only after hard-fought, arm's-length negotiations, represent the best restructuring path available for the Debtors and are, more generally, consistent with the goals of subchapter V.

## RELIEF REQUESTED

20.     By this Motion, the Debtors request, pursuant to §§ 105(a), 363(b), and 365(a) of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006, entry of an order authorizing the Debtors to enter into and assume the RSA, and perform their obligations thereunder.

## BASIS FOR RELIEF

### A.     Assumption Of The RSA Is Permitted Under § 365 Of The Bankruptcy Code

21.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject an executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Bankruptcy courts evaluate motions brought under § 365(a) under the "deferential 'business judgment' rule." Mission Prod. Holdings, Inc. v. Tempnology, LLC, – U.S. —, 139 S. Ct. 1652 (2019) (quoting NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984)). Accordingly, "[w]hen considering a debtor's request to assume an executory

12

contract under § 365, 'the only issue properly before a court is whether the assumption or rejection of the subject contract is based upon a debtor's business judgment.'" In re Charles St. Afr. Methodist Episcopal Church of Bos., 499 B.R. 66, 104 (Bankr. D. Mass. 2013) (quoting Eagle Ins. Co. v. BankVest Capital Corp. (In re BankVest Capital Corp.), 290 B.R. 443, 447 (1st Cir. BAP 2003)).

22. The business judgment standard, in turn, merely requires a showing that assumption of the executory contract will benefit the estate. See In re MF Global Holdings, Ltd., 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012); see also In re Rickel Home Ctrs., Inc., 209 F.3d 291, 298 (3d Cir. 2000) ("Section 365 enables the [debtor] to maximize the value of the debtor's estate by assuming executory contracts and unexpired leases that benefit the estate and rejecting those that do not."). "Once a debtor articulates a valid business justification, '[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" In re Charles St. Afr. Methodist Episcopal Church of Bos., 499 B.R. at 104 (quoting Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992)); see also Computer Sales Int'l v. Fed. Mogul (In re Fed. Mogul Global, Inc.), 293 B.R. 124, 126 (Bankr. D. Del. 2003) (explaining that under the business judgment standard, a court should defer to the debtor's decision, "unless that decision is the product of bad faith or a gross abuse of discretion").

23. Accordingly, so long as a debtor exercises "reasonable" business judgment, a court should approve the proposed assumption. See, e.g., Bildisco & Bildisco, 465 U.S. at 523; In re Mkt. Square Inn, Inc., 978 F. 2d 116, 121 (3d. Cir. 1992) (the "resolution of [the] issue of assumption or rejection will be a matter of business judgment by the bankruptcy court").

24. As set forth above, the Debtors' decision to assume the RSA is an exercise of their sound and reasonable business judgment. First, the RSA is the product of extensive, arms' length negotiations among the Debtors and the Consenting Lenders. Second, assumption of the RSA is necessary to ensure the support of the Debtors' largest secured creditors (and three senior lienholders) throughout the chapter 11 process, including on vital issues such as cash collateral and plan terms. Locking up this broad support through the RSA will help the Debtors expeditiously emerge from chapter 11 and avoid protracted disputes in the cases, resulting in substantial savings for the Debtors and reducing business disruptions. These benefits, in turn, will also accrue to the Debtors' creditors and other stakeholders. Finally, the terms of the RSA are fair and reasonable under the circumstances, and do not prejudice the rights of other parties in interest. Accordingly, this Court should approve assumption of the RSA as a sound exercise of the Debtors' business judgment.

**B.    Entry Into The RSA Is Authorized By §§ 105 And 363 Of The Bankruptcy Code**

25. The Debtors' entry into the RSA also is authorized under § 363(b) of the Bankruptcy Code, which provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts authorize a debtor's use of property of the estate outside the ordinary course of business when such use has a "sound business purpose" and is proposed in good faith. See, e.g., Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153-54 (D. Del. 1999); see also Meyers v. Martin (In re Martin), 91 F.3d 389, 394-95 (3d Cir. 1996). Once a debtor articulates a valid business justification under § 363, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief the action was in the best interest of the company. See, e.g., In re Integrated Res., Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); Bridgeport Holdings Inc.

14

Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.), 388 B.R. 548, 567 (Bankr. D. Del. 2008).

26.    Additionally, under § 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Courts have relied on both §§ 105(a) and 363(b), in addition to § 365, when approving a restructuring support agreement, finding that such relief is consistent with the applicable provisions of the Bankruptcy Code. See, e.g., In re Cred Inc., Case No. 20-12836 (JTD) (Bankr. D. Del. Feb. 5, 2021) [D.I. 480]; In re GNC Holdings, Inc., Case No. 20-11662 (KBO) (Bankr. D. Del. Oct. 8, 2020) [D.I. 1360]; In re Chaparral Energy, Inc., Case No. 16-11144 (LSS) (Bankr. D. Del. Dec. 14, 2016) [D.I. 652].

27.    Entering into the RSA is a sound exercise of the Debtors' business judgment for the reasons set forth above. In short, the benefits of the RSA to the Debtors, their estates, and parties in interest are manifest. It is finalized and actionable right now—subject to Court approval—and builds the necessary consensus among the three first lienholders to achieve a pathway to consensual plan confirmation and to avoid interim disputes along the way. Failure to obtain approval of the RSA, on the other hand, would mean uncertainty, delay, and significant administrative costs for the estates. Accordingly, entry into the RSA is grounded in the Debtors' sound business judgment and should be approved.

C.    **The RSA Does Not Violate § 1125(b) Of The Bankruptcy Code**

28.    Entering into the RSA does not constitute a "solicitation" of the Consenting Lenders' votes in favor of a plan under § 1125 of the Bankruptcy Code.

29.    Section 1125(b) provides that "[a]n acceptance or rejection of a plan may not be solicited after the commencement of the case under this title . . . unless, at the time of or before such solicitation, there is transmitted . . . a written disclosure statement approved, after notice

and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b). Courts considering both prepetition and postpetition restructuring support agreements have held that such agreements are not "solicitations" if they permit a party to the agreement to later vote to reject a plan if there are any material deviations from the representations made at the time of signing the plan support agreement. See, e.g., In re Neb. Book Co., Case No. 11-12005 (Bankr. D. Del. Sept. 7, 2011) [D.I. 557] (approving a postpetition plan support agreement pursuant to which creditor agreed to vote in favor of plan provided there were no material modifications to the agreed upon plan); In re Intermet Corp., Case No. 08-11859 (KG) (Bankr. D. Del. June 5, 2009) [D.I. 1066] (same); see also In re Heritage Org., LLC, 376 B.R. 783, 789-95 (Bankr. N.D. Tex. 2007) (finding that an agreement to vote for a plan in a term sheet does not constitute a solicitation for an official vote); In re Kellogg Square P'ship, 160 B.R. 336 (Bankr. D. Minn. 1993) (holding that secured creditors' agreement to vote for plan prior to approval of disclosure statement did not violate statutory restrictions on solicitation).

30. Accordingly, the Debtors' and the Consenting Lenders' negotiation and execution of the RSA does not constitute improper solicitation under § 1125(b) of the Bankruptcy Code, and the Debtors submit that they should be permitted to enter into and assume the RSA.

## BANKRUPTCY RULE 6004 WAIVER

31. In addition, by this Motion, Debtors seek a waiver of any notice requirements under Bankruptcy Rule 6004(a) and any stay of the effectiveness of the order(s) approving this Motion. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As set forth above, including because of the many impending deadlines in the RSA, the Debtors require immediate

16

relief to implement the foregoing successfully. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

## NOTICE

32.  Notice of this Motion shall be served on the following parties on the date and in the manner set forth in the certificate of service: (a) the United States Trustee; (b) the Debtors' secured creditors or, if applicable, to counsel representing them; (c) the top twenty (20) non-insider unsecured creditors of each of the Debtors or, if applicable, to counsel representing such holders; (d) applicable federal and state taxing authorities; and (e) any attorney of record or party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the circumstances of the Debtors' chapter 11 cases and the nature of the relief sought herein, the Debtors submit that no further notice of this Motion is required.

## CONCLUSION

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, the Debtors respectfully request that this Court enter an order, substantially in the form filed herewith, granting the relief requested in the Motion and such other and further relief as is just and proper.

Dated:   September 23, 2021                    Respectfully submitted,

**BERNSTEIN, SHUR, SAWYER & NELSON, P.A.**

*/s/ Adam R. Prescott*
Adam R. Prescott, Esq.
Letson D. Boots, Esq.
100 Middle Street
PO Box 9729
Portland, Maine 04104
Telephone: (207) 774-1200
Facsimile: (207) 774-1127
aprescott@bernsteinshur.com
lboots@bernsteinshur.com

*Proposed Counsel to the Debtors and Debtors in Possession*